UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 3:12-CR-90-TAV-HBG |
| ) | |
| JOYCE E. ALLEN, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

This criminal case is before the Court on the defendant's Post-Trial Motion for New Trial pursuant to Federal Rule of Criminal Procedure 33 [Doc. 254]. The government has responded in opposition [Doc. 269]. Having reviewed the record and considered the parties' arguments in light of the relevant and controlling law, the defendant's motion will be denied.

**I.  Background**

The defendant, Joyce E. Allen, was charged in all ten counts of the Third Superseding Indictment, four for conspiracy and six for uttering fraudulent securities [Doc. 141]. The charges relate to her role in marketing purported investments in Benchmark Capital, a Ponzi scheme orchestrated by Charles Candler that collapsed upon his suicide in March 2012 ("the Benchmark Scheme") [Doc. 255 p. 1]. The Benchmark Scheme involved presenting investors with materials that appeared to be authentic and

making false representations about the investments and about how the funds would be used [Doc. 141 p. 5].

Count one charged the defendant with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 [*Id.* at 8]. Count two charged her with conspiracy to commit wire fraud, in violation of the same [*Id.* at 17]. Counts three and ten charged her with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) [*Id.* at 19, 23]. Counts four through nine charged the defendant with uttering fraudulent securities, in violation of 18 U.S.C. § 513 [*Id.* at 20].

On September 8, 2014, the defendant proceeded to a jury trial [Doc. 255 p. 1]. The jury returned a verdict on September 22, 2014, finding the defendant guilty on all counts [*Id.*]. The defendant now asserts that, "[i]n the unique circumstances of this case, the Court should grant the defendant a new trial as the jury's verdict was against the manifest weight of the evidence. It was apparent from the evidence and testimony that Allen was not aware that Benchmark was a Ponzi scheme and was deceived and used by Candler" [*Id.* at 4–5]. The defendant does not specify which of the jury's ten findings she is contesting, but from footnote five and the motion as a whole, it appears she is contesting all of them [*See generally id.*].

II.  Analysis

   A.  **Standard of Review**

Rule 33 of the Federal Rules of Criminal Procedure provides that, upon the defendant's motion, the Court may grant a new trial "if the interest of justice so requires."

Fed. R. Crim. P. 33(a). A motion for a new trial under Rule 33(a) "may be premised upon the argument that the jury's verdict was against the manifest weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). "Generally, such motions are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *Id.* at 592–93 (citation and internal quotation marks omitted). In considering a Rule 33(a) challenge to a conviction based on the weight of the evidence, a court "can consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that . . . [the judge] sits as a thirteenth juror." *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988) (citation omitted).

### B. Evidence Discussed by the Parties

Allen's motion highlights the trial evidence that she claims supports that she did not know Benchmark was fraudulent [*See* Doc. 255 p. 5–7]. She discusses her trial testimony, her emails to Charles Candler and others, and her request for updated passwords to access the status of her and her husband's investments in Benchmark [*Id.* at 5–6]. In essence, Allen argues that knowledge of the fraudulent scheme is entirely inconsistent with referring to company policies in emails, requesting access to her and her husband's account information, and encouraging close family members to invest in Benchmark [*See id.* at 5–6]. Allen also emphasizes that none of her emails or the government's surreptitiously-recorded conversation between her and a codefendant indicate that Allen knew about the scheme [*See id.* at 5–7].

3

Case 3:12-cr-00090-TAV-HBG   Document 293   Filed 12/31/14   Page 3 of 12   PageID #: 4298

The government responds that Allen's "purported lack of knowledge cannot be squared with the facts of the case" [Doc. 269 p. 5]. The government begins by listing evidence that indicates Allen knew or should have known Benchmark was a scam: there was no agent training; each client's application had the same "Deposit Control Number"; Allen was permitted to write her own commission checks; and Allen did not receive, for example, phone calls, faxes, or promotional materials from the Chicago headquarters of what Allen allegedly believed was a major company [*Id.* at 6].

The government then points to "more blatant indicators of Benchmark's true nature" [*Id.*]. In 2008, Allen was named in the *Muncey* lawsuit [*Id.*]. The lawsuit specifically alleged that neither Candler nor Benchmark was licensed to sell insurance in Tennessee, that Candler had fraudulently held out Benchmark as a Chicago corporation even though it was not registered there, and that Benchmark was being fraudulently held out as a member of "North American Association for Life and Health," an entity that did not exist [*Id.*]. A copy of the complaint and papers associated with the *Muncey* lawsuit were found in Allen's desk drawer [*Id.*].

Next, the government recalls the significance of the state and federal investigators' testimony [*See id.* at 6–7]. Allen sidestepped the state investigator's demands for information and an interview and, when she did not comply with a subpoena for the same, she was stripped of the insurance license she had held for twenty-three years [*Id.*]. The witness from the Securities and Exchange Commission testified as to the J. Allen & Associates website, where Allen claimed to sell products from numerous companies other

4

than Benchmark [*Id.* at 7]. Later in the trial, Allen admitted that Benchmark was the only product she sold, and other evidence indicated that she and Candler colluded in producing information to the SEC [*Id.*].

Lori Moore, a Florida bookkeeper who had been recruited as an associate of J. Allen & Associates [*Id.*], also testified at Allen's trial. Moore became concerned with Allen's practices and asked Allen to answer some basic questions, including how she could sell insurance products without an insurance license [*Id.*]. Despite writing Allen multiple times with questions and concerns, Moore did not receive answers from Allen [*Id.*].

The government concludes with what it believes is the most compelling evidence of Allen's knowledge of Benchmark's fraudulent nature—Allen's actions upon learning of Candler's death [*Id.* at 8]. Allen rushed to cash her Benchmark commission checks, even though she had always deposited them in the past, and she immediately withdrew the funds her family and friends had invested in Benchmark (amounting to almost one million dollars) [*Id.* at 8–9]. The government asserts, "[h]ad Allen really believed that Benchmark was a major Chicago company and that Candler was only a regional manager, the race to withdraw money would have been unwarranted," as she could have used the standard Benchmark withdrawal forms and waited the requisite thirty days for checks to arrive from Chicago [*Id.*].

5

### C. Legal Elements of the Charged Offenses

The defendant does not specify which of the jury's findings she is challenging. But by focusing on how she allegedly did not know that Benchmark was fraudulent, Allen appears to be challenging the jury's findings on every count of the Third Superseding Indictment, as each contains an element of knowledge or intent.

Allen was charged with four counts of conspiracy: one to commit mail and wire fraud, one for wire fraud, and two for money laundering. For each conspiracy count, the government was required to establish beyond a reasonable doubt that "two or more persons conspired, or agreed, to commit the crime of [mail fraud, wire fraud, or money laundering]" and "that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014) (quoting Sixth Circuit Pattern Criminal Jury Instruction 3.01A).

Knowledge can be proven through circumstantial evidence, but such evidence must be clear, not equivocal, to satisfy the government's burden of proving all elements of a crime beyond a reasonable doubt. *United States v. Morrison*, 220 F. App'x 389, 393 (6th Cir. 2007). The "consistent principle is that 'conjecture and surmise regarding what a defendant may have intended or known is insufficient to support a conviction.'" *Id.* at 395 (quoting *United States v. Coppin*, 1 F. App'x 283, 291 (6th Cir. 2001)).

Mail and wire fraud "hav[e] essentially the same elements, except for the use of the mails versus the wires." *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013). Under their respective statutes, 18 U.S.C. §§ 1341 and 1343, it is illegal to devise, intend

to devise, or willfully participate in a scheme to defraud while intending to deprive a victim of money or property. *See Kennedy*, 714 F.3d at 957–58; *see also* Sixth Circuit Pattern Criminal Jury Instructions 10.01 (mail fraud), 10.02 (wire fraud); *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) ("[P]roof of a defendant's willful participation in a scheme with knowledge of its fraudulent elements is sufficient." (quoting *United States v. Stull*, 743 F.2d 439, 442 (6th Cir. 1984))).[1]

Money laundering follows fraud. In general, money laundering consists of conducting or attempting to conduct a financial transaction, knowing the transaction involves the proceeds of unlawful activity. *See* 18 U.S.C. § 1956(a)(1); 18 U.S.C. § 1957. Section 1956(a)(1)(A)(i), which is relevant to count three, criminalizes such activity only if the person intends "to promote the carrying on of" the unlawful activity. Section 1956(a)(1)(B)(i), which is relevant to count ten, criminalizes such activity only if the person knows the transaction is designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.

Finally, for the six counts of uttering fraudulent securities, the government was required to prove Allen intended to deceive others. *See* 18 U.S.C. § 513(a); *United States v. Kellum*, 119 F. App'x 32, 34 (9th Cir. 2004) ("Section 513 only requires that a defendant utter or possess a security that is actually forged or counterfeit, and that he utter or possess the security with intent to deceive."). Whether Allen knew Benchmark was fraudulent is relevant to each of the charged offenses.

---

[1] It appears undisputed that the Benchmark Scheme was a scheme to defraud [*See* Doc. 255 p. 1–2].

7

### D. The Court's Findings

Having reviewed the elements of the offenses charged, the relevant law, and the trial evidence, the Court disagrees with the defense's contention that "on the whole the weight of the evidence as to whether Allen knew that Benchmark was fraudulent strongly predominated against the jury verdict" [Doc. 255 p. 7]. Allen does point to some evidence, and to the lack of certain incriminating evidence, that supports she may not have conspired in the Benchmark Scheme and that she may have been misled by Candler. But given the amount of evidence supporting the government's theory, the Court cannot conclude that the jury's verdict on any of the counts is against the manifest weight of the evidence. *See United States v. Funzie*, 543 F. App'x 545, 549 (6th Cir. 2013) ("That the evidence arguably points to a hypothesis other than guilt does not render the verdict against the greater weight of the evidence.").

In light of the *Muncey* lawsuit, other indicators that Benchmark was being or would be investigated, and Candler's action to delete emails, the lack of incriminating evidence in emails or recorded conversations can reasonably be seen as a plan or an understanding by Allen, Candler, and others to maintain an appearance of legitimacy and to minimize their exposure to criminal liability. The evidence supports that Allen and Candler's discussions were behind closed doors, and as the government states, "one would not expect fraudsters to discuss their schemes openly" [Doc. 269 p. 8].

The defendant testified that she did not read the *Muncey* lawsuit and that she believed she was licensed to sell Benchmark annuities through Benchmark and through

8

its attorney who had an insurance license [Doc. 255 p. 2 n.2]. But Allen was named in the *Muncey* lawsuit, and lawsuit documents were found in her desk drawer. And despite holding an insurance license for twenty-three years, Allen did not provide her associate, Lori Moore, with answers to simple questions such as how it is possible to sell insurance products without a license.

Allen emphasizes how she allowed, and even encouraged, her family to invest in Benchmark [*Id.* at 6–7]. The government suggests she did so because she could get their money out "if anything went wrong" [*Id.* at 6 n.4]. While it is arguable, the evidence supports that Allen may have had the ability, through her relationship with Candler, to retrieve the funds if needed. As eventually occurred when Candler committed suicide, Allen withdrew money for her friends and family from a bank account that had been set up in her name just weeks before with funds from checks that Candler had delivered to Allen's office [Doc. 269 p. 3, 8].

Based on the facts of this case, the Court found it proper to instruct the jury on deliberate ignorance. The Court adopted the Sixth Circuit pattern jury instruction, but, consistent with the defense's theory that Allen was duped and used by Candler, the Court added language, italicized below, that the defendant proposed:

> If you are convinced that the defendant deliberately ignored a high probability that Benchmark was a fraudulent scheme . . . , then you may find that she knew Benchmark was a fraudulent scheme . . . , *unless she actually believed to the contrary*. To find deliberate ignorance, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that Benchmark was a fraudulent scheme . . . . Carelessness, or negligence, or foolishness on her part is not the same as knowledge, and is not enough to convict.

Sixth Circuit Pattern Criminal Jury Instruction 2.09 (amended) (emphasis added).

The defense concedes that Allen made some "calamitously unwise and foolish" decisions [Doc. 255 p. 7]. But many of Allen's actions warrant a description that more accurately reflects their egregious nature. For example, she falsely held herself out as having offices nationwide and selling products other than Benchmark; she failed to cooperate with a state investigation; she failed to inquire about or research Benchmark's legitimacy, even despite the *Muncey* lawsuit's allegations; she "invested" the equity of people's homes in Benchmark when she knew the SEC was investigating Benchmark; and, when Candler died, she immediately withdrew almost one million dollars that belonged to Benchmark, an entity she supposedly believed was a major company. Even if some of Allen's decisions may appear simply unwise or foolish in isolation, when viewed together and in light of all the evidence, it is reasonable to conclude that she knew, or at least was deliberately ignorant of, Benchmark's fraudulent nature.

The defense highlights that Allen's codefendants did not testify that she knew the Benchmark Scheme was fraudulent [*See* Doc. 255 p. 7]. But the apparent reason no such testimony was elicited is because the defendant filed a motion in limine to that effect, and the government agreed not to elicit such testimony [*See* Doc. 195 p. 1 (seeking to preclude "testimony regarding or reflecting the conclusion of any person that Joyce Allen was aware that Benchmark Capital was a Ponzi scheme or that the money supplied to Benchmark for the purported annuities was not actually invested"); Doc. 218 p. 1 (stating that the government does not intend to offer opinion testimony regarding what Allen

10

Case 3:12-cr-00090-TAV-HBG   Document 293   Filed 12/31/14   Page 10 of 12   PageID #: 4305

knew or must have known about the Benchmark Scheme, and does not oppose the defendant's request)].

In closing, the defendant notes that the outcome of the trial may have been influenced by the fact that the jury was aware her codefendants had pled guilty [Doc. 255 p. 8]. It is well-settled, however, that for purposes of assessing credibility, guilty pleas may be introduced into evidence when a codefendant or coconspirator testifies at trial. *See, e.g.*, *United States v. Benson*, 591 F.3d 491, 498 (6th Cir. 2010). As required, the Court gave relevant cautionary instructions. *See id.* at 498–99; Sixth Circuit Pattern Criminal Jury Instruction 7.07 ("The fact that these individuals have pled guilty to a crime is not evidence that the defendant is guilty, and you cannot consider this against the defendant in any way."). And the Court notes that "much of the potential for prejudice is negated when the co-conspirator testifies about the underlying facts," as happened in this case. *United States v. Lombardo*, 582 F. App'x 601, 615 (6th Cir. 2014). In evaluating this motion, the Court has considered the testimony and credibility of Allen's codefendants in light of their guilty pleas, and the Court does not believe the admission or use of their guilty pleas resulted in a miscarriage of justice.

Allen's motion seeking a new trial pursuant to Federal Rule of Criminal Procedure 33 will be denied. Given the aforementioned evidence and the credibility of the witnesses, including the defendant, the Court finds the verdict was not against the manifest weight of the evidence. This case does not present the sort of extraordinary

circumstance in which the evidence preponderates heavily against the verdict, and the Court does not find that the interest of justice requires a new trial.[2]

## III. Conclusion

For the reasons explained herein, the Court hereby **DENIES** the defendant's Post-Trial Motion for New Trial [Doc. 254].

IT IS SO ORDERED.

s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

---

[2] Nor does the Court find that a new trial is warranted on count two. The defendant briefly discusses count two in a footnote, claiming "the evidence was consistent with Allen's testimony that she believed the mortgage paperwork was purely a formality, as the banks were desirous of making the loans and could have easily double-checked the information provided" [Doc. 255 p. 8 n.5]. This argument is unavailing. Three witnesses testified regarding their roles in creating false documents at Allen's behest [Doc. 269 p. 2], and the defendant's daughter, who worked for Allen doing simple tasks, unsuccessfully tried to explain why Allen reported that her daughter's annual earnings were $96,000 [*see id.*]. Even if banks were anxious to make loans and could have easily double-checked the information, it cannot be said that a finding that Allen conspired to commit wire fraud is contrary to the manifest weight of the evidence.